UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DAVID PATRICK ALFORD,

        Plaintiff,

    v.

JOE A. LIZARRAGA,

        Defendant.

Case No.  14-cv-02904-JST

**ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS**

Re: ECF No. 18

Before the Court is Plaintiff David Patrick Alford's Petition for a Writ of Habeas Corpus, ECF No. 18.  The government filed an answer to the petition, ECF No. 21, and Alford filed a traverse, ECF No. 26.  The Court will grant the petition.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

No party before the Court disputes that the state court presiding over David Alford's murder trial committed federal constitutional error.  The California Court of Appeal held, and the government does not dispute, that the state trial court erred by admitting as evidence a pre-trial custodial interrogation of Alford that was conducted in violation of Miranda v. Arizona, 384 U.S. 436 (1966).  The only question before the Court is whether this error was harmless under Chapman v. California, 386 U.S. 18 (1967).

Alford's trial took place in February and March of 2011 in the County of Santa Cruz, based on events that occurred on April 20, 2009.  Alford was convicted of second degree murder on March 18, 2011.  Both sides adopt the California Court of Appeal's statement of the facts:

> There is little dispute about the events leading to defendant's murder conviction. All agree that defendant fatally shot Hans Hugo Heath in the head as Heath sat in the front passenger seat of defendant's Lexus sport-utility vehicle and that defendant disposed of Heath's body by casting it over the side of a coastal highway. The only dispute at trial concerned defendant's mental state when he killed the victim.

Almost all of the evidence regarding the few disputed facts came from defendant's testimony.  There were no witnesses to the killing other than perhaps defendant's 24–year–old daughter, Laura Alford (Laura).  Because the state charged her with being an accessory (Pen.Code, § 32) to the murder of Heath—although the parties inform us that the jury acquitted her—she was not required to testify and did not do so.

The prosecution's favored theory, advanced through cross-examination and at closing argument, was that defendant killed Heath in anger, and with sufficient premeditation and deliberation to constitute a first degree murder (Pen Code, § 189), due to the victim's belligerence, uncouth behavior, and vulgarity.

Defendant testified that on April 20, 2009, he met Heath at a liquor store near defendant's home in Santa Cruz. Heath, considerably intoxicated, was loitering there, and defendant, evidently out of courtesy or a desire to converse, invited him over to his house.

Laura was at the house when her father showed up with his guest. Heath tried to put his arms around Laura and dance with her. Laura pushed him away. Heath also made licentious remarks about Laura's physical attributes. Defendant told Heath to stop. Heath commented that he had just been released from the California State Prison at San Quentin, could slit the throats of defendant and his wife at any time and kill their children, and would be indifferent to doing it.

As tensions arose, Heath "started kicking at me" and "throwing punches," defendant testified. The record suggests generally that defendant had an obsession with tidiness, and defendant not only had to deal with Heath's physical aggression but was irritated that Heath was lying on his couch without removing his boots and hat. He decided that Heath should leave. Defendant, Heath, and Laura went to the Lexus and got in. Laura drove; Heath was in the front passenger seat and defendant sat behind him.

Heath continued to make belligerent remarks and soon he "started grabbing at Laura's arms and at the steering wheel." As the vehicle swerved, defendant tried to grab Heath, flailed at him, and yelled at him to get his hands off Laura. At the same time Heath was grappling with Laura, he flailed back at defendant, trying to grab his arms and hair. Defendant was afraid for the safety of Laura; he feared that Heath was about to cause a serious automobile accident. "I was extremely concerned we were going to have an accident with the vehicle," he testified, "and that we would be seriously injured...." He was also trying to get Heath to "stop attacking my daughter." It was "a matter of self defense" and "of protecting my daughter," he explained on cross-examination.

Then defendant killed Heath, using a handgun that was in a camera case at his feet in the rear seat. On direct examination, he testified as follows:

"Q. Why did you grab the pistol?

"A. Because I wanted to hit him in the head with it to inflict enough pain so he would stop grabbing at my daughter and the steering wheel and I could sit him up in the front seat and regain control of the vehicle.

"Q. Which hand did you have the pistol in?

"A. My right hand.

"Q. How were you holding it?

"A. By the handle.

"Q. What did you attempt to do with it?

"A. I tried to hit him in the head with it to inflict enough pain that he would stop attacking my daughter.

"[¶] ... [¶]

"Q. Were you doing anything with your left hand at that point?

"A. ... I was pulling his ... head ... to sit him up[,] pulling his head in the opposite direction.

"Q. So what did you actually do with the gun?

"A. Well, I came down to hit him in the head. I believe that I grazed his head. And then there was a flash and a bang and I realized that the gun had discharged.

"Q. Were you expecting that to happen?

"A. No, by no means was I expecting it to happen.

"Q. Did you intend to have the gun discharge?

"A. No, sir.

"[¶] ... [¶]

"Q. After the gun went off, what happened to Mr. Heath?

"A. Unfortunately, Mr. Heath went completely limp. And I was able to sit him up in the seat in an upright position.

"[¶] ... [¶]

"Q. Could you tell at that time what had happened to him?

"A. Unfortunately, yes.

"Q. What could you determine?

"A. I determined that the round went through the back of his neck and out the ... left side of his skull.

"Q. What was going through your mind at that point?

"A. Panic. Total panic. I did not—could not believe what had transpired."

Later, defendant and his counsel had this exchange before the jury:

"Q. Did you want to kill Mr. Heath?

3

"A. No, by no means.

"Q. Did you intend to kill him?

"A. No, sir.

"Q. Did you intend for the gun to go off?

"A. No, sir.

"[¶] ... [¶]

"Q. What were you trying to do when you took the gun out?

"A. Trying to stop him from attacking my daughter."

Cross-examination of defendant elicited a detailed second-by-second description of the moments before he killed Heath:

"Q. ... [W]hat part of the gun were you holding?

"A. I was holding the handle, the—where the clip goes inside.

"Q. The grip?

"A. The grip.

"Q. So you just had your hand around it, the grip?

"A. That's correct.

"Q. And then you started hitting him in the head?

"A. That is correct.

"[¶] ... [¶]

"A. ... I'm hitting with the butt of the gun with the bottom of the clip.

"[¶] ... [¶]

"Q. Sort of overhead and the gun's coming out the bottom of your hand and you're hitting him with it?

"A. That's correct.

"[¶] ... [¶]

"Q. Now, you heard the testimony that Mr. Heath was shot on the right side of his neck; right?

"A. Correct.

"Q. How's the gun hit[ting] him there if you're hitting him only with the butt?

"A. It may have slid down. Apparently it had slid down past the top of his head

4

down toward his neck.

"Q. Apparently?

"A. Apparently so. I mean, that's quite obvious. There's a hole there.

"[¶] ... [¶]

"Q. And it's your testimony that somehow when you were hitting him in the head, holding just the grip, that the gun somehow accidently fired and shot him in the back of the neck and passed through his skull?

"A. That is correct. And my hand was on the other side of his head.

"[¶] ... [¶]

"Q. You're holding his head—

"A. Trying to pull him off Laura, yes.

"Q. Now, when you picked up the gun, did you stick your finger in the trigger guard?

"A. More than likely.

"Q. You don't remember?

"A. Not specifically, no, but that's how typically you hang on to the gun the best.

"[¶] ... [¶]

"Q. To use as a bludgeon to hit somebody with? You think you hold on to it with your finger in the trigger guard?

"A. Yes, ma'am.

"Q. Were you trying to shoot him?

"A. No, ma'am.

"Q. Then why did you put your finger in the trigger guard if in fact you did?

"A. Because that's how you typically can hang on to the handle without it flying out of your hand the best.

"Q. So you don't think you could have just held the handle without putting your finger in the guard and hit him with the butt?

"A. I believe the gun probably would have went flying out of my hand.

"Q. Why do you think that?

"A. Because of just the way you hold the grip on the gun.

"[¶] ... [¶]

"Q. Now, you testified that you hadn't had any experience with guns?

"A. That's correct.

"Q. Why did you testify earlier ... that that's where you hold a gun is by putting your finger in the trigger guard?

"A. Well, that's what I've seen from the past 40 years as far as someone holding a gun and shooting it."

Also on cross-examination, defendant testified that he told Heath he could kill him just as Heath was threatening to kill everyone in defendant's family. But defendant considered Heath's threats to be the ramblings of a drunk person and not conveying a serious menace. As cross-examination continued, defendant could not explain why he failed to register the gun despite knowing that it had to be registered. Defendant also testified that he had Laura drive home. He dropped her off and drove away with Heath's body in the vehicle. He deposited the body at an isolated spot along the coast.

Defendant acquired the gun in the early 1990s. A neighbor in Oregon, where he used to live, gave it to him. He would carry it on construction industry business trips in which he carried large amounts of cash. The last time he serviced it, about a decade before the killing, he was unaware that it was loaded. He saw at that time that the clip held a bullet but did not believe that there was a round in the chamber and did not check to see if there was one.

The authorities were not long in identifying defendant as the suspect in Heath's killing. They found the phone number of one Robert Ledesma in a pocket of Heath's clothing. Before they could locate Ledesma he contacted them, having heard about the killing of Heath, and he told them that Heath had called him on the night of April 20, 2009, i.e., the night that Heath was at defendant's house. Heath, who was drunk, said that he was at the house of people who had lived in Oregon, as defendant had and Laura still did. The authorities traced Heath's call back to the telephone of Laura. After arresting defendant and Laura, they examined defendant's vehicles and found blood throughout the front part of the Lexus, although its interior had been cleaned. Deoxyribonucleic acid analysis showed some of the blood to be Heath's and some defendant's. They also found gunshot residue in the front part of the vehicle.

The authorities took defendant to a station for questioning on suspicion that he had killed the victim. Two detectives, one from Santa Cruz County and one from Monterey County, questioned defendant. As noted, the interrogation was recorded.

Before trial, the prosecution moved to admit defendant's statements during that interrogation. Defendant moved to exclude them. As we will describe further below, the trial court denied defendant's motion and, as part of its case-in-chief, the prosecution played a video recording and an audio recording of defendant's statements to the jury.

During the interview, one of the detectives read defendant his *Miranda* rights, and defendant indicated he understood them. He asked if he was under arrest and was told that he was not.

After acknowledging his understanding of his *Miranda* rights, defendant described making dinner and drinks for himself and Laura. When asked if anyone else was present, defendant first said no, and then stated, "I think at this point I would like

6

an attorney. Cause I don't know how to answer the questions correctly." One of the detectives asked, "Are you saying you don't want to talk to me anymore and you'd rather have an attorney here?" Defendant replied, "Well, I don't, I don't know, there was an individual that happened to stop by and he was there for about an hour and we told him to get the heck out of there ... this guy was crazy. And I don't know where we're going with that. And so I'm, I'm, concerned."

The detective asked, "what are you saying? You don't want to ... talk to us anymore without an attorney?" Defendant replied, "I don't know ... the correct thing to do here[,] guys." The detective said, "the truth is always the right thing to do."

Defendant said that if he continued to speak with the detectives "I don't think that will allow me to walk out [of] here tonight." "I'm concerned of how ... I present it so that ... the situation doesn't end up ... unfolding correctly [*sic* ].... I really don't know what to do here[,] guys." Again the detective recommended that defendant confess, saying that "being truthful is the way to go." Defendant said, "I have every intention of doing that. But I want to make sure that I do that[ ] correctly[;] that's my only concern."

Continuing to debate with himself about the right course of action, defendant said, "maybe I've watched too much T.V.... I don't know what the correct thing to do here[ ] is[;] I know what transpired and had to happen. Okay?"

The detectives waited for defendant to speak further, and he volunteered, "it's not a good situation. A waste." Then he resumed debating what to say: "I'm really trying to choose my words correctly[,] guys. Um, suffer the consequences because [of] someone else's ignorance, ignorant actions, well, I don't know how else to say it. And I just want to make sure that I do it right."

A detective said that they were willing to hear defendant's explanation, but defendant replied, "that's still going to put me in the slammer for X amount of time...." Without further ado, defendant said, "we were attacked and I had to do something about it." He then reverted to wondering what to say: "I don't know what else to do here other than to say, okay, do I, do I talk to an attorney ... I don't know what to do[,] guys."

One of the detectives asked, "who attacked you?" and defendant said someone "so intoxicated and so belligerent that I couldn't understand him." After defendant had the man come over to his house, he started acting peculiarly. Defendant offered to take him to the nearby town of Soquel. Defendant said Laura was driving and he had to do something to stop Heath. Defendant continued to provide information about the man, including his bizarre and sometimes vulgar behavior, and other details about the evening, none of it directly inculpating him or Laura—rather, defendant was "trying to diffuse [*sic:* defuse] the situation." He then said, "we finally convinced him, okay, hey look, get in the car, let's take you up to Soquel, you can go do whatever you want to do.... And ... that's all I ... want to say without talking to some legal counsel...." The interview ended after the detectives made further efforts to persuade defendant to provide additional information and he declined to do so.

Based on the evidence, the trial court instructed the jury on a number of options.

With regard to the substantive law of unlawful homicide, the court instructed the jury that it could convict defendant of first or second degree murder or voluntary or involuntary manslaughter. With regard to murder, the court explained the concepts of express and implied malice. With regard to manslaughter, the court explained the

7

1   concepts of provocation and imperfect self-defense. The court also told the jury that
    it could acquit defendant on the basis that the homicide was justifiable or excusable
2   and therefore lawful. The basis for a justifiable homicide could be defendant's
    lawful defense of himself or Laura. Mere accident, the jury learned, constituted
3   excusable homicide.

4   As for the gun-use sentence enhancement statute (§ 12022.53), the trial court also
    instructed the jury on a number of options. In terms of increasing seriousness, the
5   jury was informed that it could find that defendant merely used a firearm, that he
    intentionally fired a firearm, or that he intentionally fired a firearm and injured or
6   killed someone as a result. The jury chose the least serious of these three options.

7   People v. Alford, No. H036961, 2013 WL 1248131, at *1-5 (Cal. Ct. App. Mar. 28, 2013)

8   (unpublished).

9       Alford petitioned the California Supreme Court for review on May 8, 2013, which

10  was denied without comment on June 12, 2013.  He then petitioned for a writ of habeas of

11  corpus in the California Supreme Court in 2014, which was also denied.

12  **II.      STANDARD OF REVIEW**

13      This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in

14  custody pursuant to the judgment of a State court only on the ground that he is in custody in

15  violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); Rose

16  v. Hodges, 423 U.S. 19, 21 (1975).

17      A district court may not grant a petition challenging a state conviction or sentence on the

18  basis of a claim that was reviewed on the merits in state court unless the state court's adjudication

19  of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable

20  application of, clearly established Federal law, as determined by the Supreme Court of the United

21  States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in

22  light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Williams v.

23  Taylor, 529 U.S. 362, 412-13 (2000). Additionally, habeas relief is warranted only if the

24  constitutional error at issue "'had a substantial and injurious effect or influence in determining the

25  jury's verdict.'"  Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507

26  U.S. 619, 637 (1993)).

27      A state court decision is "contrary to" clearly established Supreme Court precedent if it

28  "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it

United States District Court
Northern District of California

"confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 405-06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

Alford challenges the Court of Appeal's holding that the trial court's Miranda error was harmless.  "The test for whether a federal constitutional error was harmless depends on the procedural posture of the case." Davis v. Ayala, 135 S. Ct. 2187, 2197 (2015).  Because the California Court of Appeal heard the case on direct appeal, it used the standard from Chapman v. California, 386 U.S. 18, 24 (1967): "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."  In a collateral proceeding such as this one, however, courts use the test defined in Brecht v. Abrahamson, 507 U.S. 619, 637 (1993), which requires a habeas petitioner to demonstrate that his trial error "resulted in 'actual prejudice,'" or that it "had substantial and injurious effect or influence in determining the jury's verdict."

Therefore, this Court is tasked with using the Brecht standard to review the state court's harmlessness analysis conducted under the Chapman standard.  In such situations, the Supreme Court has held that "the *Brecht* standard 'subsumes' the requirements that § 2254(d) imposes when a federal habeas petitioner contests a state court's determination that a constitutional error was harmless under *Chapman*." Ayala, 135 S. Ct. at 2198; see also Fry v. Pliler, 551 U.S. 112, 120 (2007) ("[I]t certainly makes no sense to require formal application of *both* tests (AEDPA/*Chapman* and *Brecht*) when the latter obviously subsumes the former.").  In short, the proper standard of review for Alford's challenge is under Brecht v. Abrahamson.

As noted, Brecht requires a petitioner to show that a constitutional error had a "substantial and injurious effect or influence" on the result of his trial.  This standard is satisfied when a judge

possesses "grave doubt about the likely effect of an error on the jury's verdict," or "the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." O'Neal v. McAninch, 513 U.S. 432, 435 (1995).

> If, when all is said and done, the [court's] conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand.... But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence.

Id. at 437-438 (quoting Kotteakos v. United States, 328 U.S. 750, 764-65 (1946).

## III.   DISCUSSION

### A.   Petitioner's Position

Alford contends in his petition that the erroneously admitted interrogation caused him actual prejudice because "the prosecutor made a comparison of petitioner's pretrial interrogation with his trial testimony the cornerstone of her attack on petitioner's credibility." ECF No. 18 at 14. His position is that the jurors might have "believe[d] Alford's testimony that his shooting of the alleged victim occurred accidentally when he acted in self-defense, thereby acquitting him or finding him guilty of manslaughter." Id. Thus, he contends, the prosecutor's "near-singular purpose from the very outset of her closing argument was to brand Mr. Alford a 'liar.'" Id.

As support for this theory, Alford relies on two sources. First, and primarily, he relies on the prosecution's closing argument. Second, he also points to the jury's multiple requests to re-hear and re-watch the interrogation during their deliberations as confirmation that the prosecution's strategy succeeded.

#### 1. Closing Argument

Alford's argument in regards to the prosecution's closing argument focuses on the prosecutor's numerous references to Alford's statements in his interrogation as evidence of his lack of credibility. A prosecution's focus on erroneously admitted evidence in closing argument can be strong evidence of that evidence's substantial effect. See Garcia v. Long, 807 F.3d 771, 783 (9th Cir. 2015) (concluding "[g]iven the record here — in particular the prosecution's closing

10

argument" that admission of an interrogation in violation of <u>Miranda</u> was prejudicial under <u>Brecht</u>).

The Court of Appeal, as well as both parties, all offer differing interpretations of various pieces of the closing argument.  Therefore, the Court begins its discussion by examining it in detail.

The prosecutor began her closing argument by positing to the jury that "[t]he only issue that's really in dispute that is important to the resolution of these charge, excuse me, the charges against David Alford, is what happened in the car."  ECF No. 16, Ex. 1 ("Closing Argument") at 5.  Before embarking on her discussion of the various charges and evidence offered in the case, she then asked the jurors to keep the following in mind:

> Now, a couple of things. As you evaluate the evidence that was only provided by the defendant about what happened in the car, keep in mind (1) *when he had a chance to tell the police when the events were fresh in his mind and he had a big incentive to tell them the truth because he was being questioned about a murder, he did not tell them one thing. Not even a little thing that would constitute a defense to the charge of murder. Not one thing.* Why not? Because there isn't anything to justify his shooting of Mr. Heath. It was murder. And in the intervening almost two year period, he's had time to think up his story. *He told you – made up a story for the police. Well, made up a story for you. And he's had a lot of time to think of the details of that story and what facts would potentially constitute a defense to murder.*
>
> Now as it relates to whether or not there's a dispute in the evidence, also keep in mind that the defendant's lying and telling inconsistent stories does not create a dispute in the evidence. *It just shows he's a liar. And one of the questions that you're going to be asking yourselves in this case is why did he lie about the things he lied about?* Not just evaluating the relative credibility of what he said but why did he lie about the things he lied about? Particularly because the lies were so implausible.

Closing Argument at 5-6 (emphasis added).

A couple of paragraphs later, she explained to the jury: "And so based on what he said with the comparison to what he said almost two years ago, you have to determine whether or not his story holds any water.  And let's be frank.  To describe it as leaky is being generous.  There is very little he told you that was true."  <u>Id.</u> at 6.

Following this, the prosecutor explained the structure of the charges and the applicable law to the jury.  <u>Id.</u> at 6-33.  In doing so, she paused occasionally to discuss the facts of the case, most

United States District Court
Northern District of California

United States District Court
Northern District of California

notably when explaining the concept of self-defense, and Alford's testimony in relation to it:

> So I'll talk about -- well, I'll talk about the facts a little bit now. In this situation what the defendant said is that Mr. Heath was reaching for Laura's arm and the steering wheel. A physical impossibility but he was grabbing all those things. At the time the shot was fired. He also said he was grabbing an arm and he had one arm behind. He went back and forth about what was happening when the shot was fired. He also said that he was clocking him in the head with the butt of the gun. I'm not even going to mention at this point he didn't know it was loaded and on and on an on.  Talk about that in a bit.
>
> Okay.  So is that credible?  First of all, there's no corroboration for any of that. None.  There's not even any corroboration for the fact that the car was moving. None.  But additionally what you have as far as physical evidence that completely contradicts that?  You have the nature of the injury.  And there's a photograph of it in this presentation.  And Dr. Mason spent some time talking to you about it.  The entrance wound was the gun being held sideways.  How are you hitting somebody in the head with butt of a gun and then somehow you're holding it tightly sideways to that person's neck?  It's not credible and it's not consistent with the evidence. And there are all kinds of problems about the defendant's credibility.  I'm actually going to go through those.  *But one of the obvious ones is why didn't he tell the police?  Why didn't he tell the police about the stuff that actually mattered in this case?  The only thing that matters as far as the defense is what happened in the car.  Nothing that happened earlier matters.  Legally.  For what?  For justification for murder.  So why didn't he tell the cops the stuff that mattered?  Because it didn't happen.  Didn't happen.  He's had almost two years to think about a defense.  But the only reasonable interpretation of the facts that he didn't tell them then is because those events didn't happen.*

Id. at 19-20 (emphasis added).

Following her legal discussion, the prosecutor summarized the testimony and evidence the jurors had heard.  She noted evidence regarding the state of the victim's body when he was found, id. at 34-35, the testimony of various witnesses that placed Alford with the victim at his house and in his car on the date of the alleged crime, id. at 36-37, and testimony from Laura's sister, Quinn, that Laura did not tell her anything about any altercation with the victim, id. at 38.  She also described evidence on the state of the victim's body, which provided information such as the state of the body when it was disposed and how the body was likely brought to that location.  Id. at 38-41.[1]  Other evidence offered from several witnesses included testimony regarding an injury to Alford's finger that "is consistent with a bullet strike," and the victim's blood being found in the

---

[1]     This evidence, as the prosecutor notes, was relevant primarily to attacking Alford's credibility in reference to the role of his daughter Laura.  See Closing Argument at 41 ("That explanation that makes absolutely no sense.  The reason he said that is because it precludes you from finding that Laura helped him.").

driver's seat of the car (although attempts had been made to clean it).  Id. at 43-49.

She then turned to the defendant's character, and described him in the following way:

> Now, I'm going to talk about David Alford. *And what you have with David Alford is you've got basically two stories. You've got the story he told the Detectives. You got the story he told you. They in a variety of respects are inconsistent.*  But they're also intrinsically inconsistent.  In other words, his testimony to you was not inconsistent within itself.  And there was testimony that he gave to the detectives that was inconsistent with what he said to you and was also had some internal inconsistencies.  *One of the things that you really need to pay some mind to is he told you that when he talked to the detectives he made up a story. In other words, he lied to them. You know what's funny about that?  Most of what he told the detectives, almost all of what he, frankly, told the detectives related to what happened at the house.  And it was consistent for the most part with his testimony in court.  So what do you get from that?  He lied about lying.*
> …
>
> There's nothing tricky about telling the truth. *Again what you've got with Mr. Alford both when he's talking to the detectives, talking to you and comparing the two in consideration of the rest of the evidence is you have a very dramatic and explicit example of how it's really hard to lie.  It's really hard to lie.*  It's really hard to think up your lies ahead of time and be able to describe them in detail.  It's hard to be questioned about them because maybe you didn't anticipate having to talk about that.  It's very, very hard to lie consistently, which is why it's so much easier to tell the truth.  Not tell the truth correctly.  Just to tell the truth.
>
> Now, his truth. He told the detectives that I would like to do that and I have every intention of doing that. That's not telling the truth. That's his perspective of telling the truth.  Not like he didn't have a chance.  That interrogation was a little over 30 minutes. *He could have told them the truth. According to him he choose not to.  But again what's most important about that interrogation and what was said and what wasn't said is he said not word one about anything that would constitute a defense in this case.  Not word one one.  The only thing he said about getting in the car was they got in the car.  His daughter was driving and it got ugly.  There were statements to that effect.  He did not describe at all the things he told you from the witness stand that if you believe them could constitute a defense.  All the big ticket items for purposes of this trial he left out. Every single one.*

Id. at 50-52 (emphasis added).  The prosecutor then proceeded to walk through Alford's

interrogation in detail.  She began with his demeanor:

> You have photographs of him that were taken that night that don't show a man with his legs crossed and sitting there calmly.  They don't show someone who's intimidated.  They don't show somebody even with an expression on his face that suggests stress or anxiety about the situation in which he finds himself. And this is from a person who said he just made up something to tell the detectives. *A lot of the defendant's conduct in this case, and I'm going to highlight different aspects of it, are fundamentally inconsistent, incongruous with what you would expect - - how you would expect somebody to behave if they had just killed somebody by accident. If you killed somebody, you didn't mean to, as he testified "unfortunately Mr. Heath slumped over," you would tell the police that.  Separate and apart from calling the police and telling them that it happened at the beginning, those are the things like - - those would be the things like, "oh, my God.  What did I do?  What*

*did I do?  What did I do?  What did I do?"  You're not going to destroy all the
evidence.  You're not going to sit calmly and talk to the detective in your driveway
about the Lexus. You're not going to sit calmly in an interrogation room*

Id. at 52-53 (emphasis added).

Next, she summarized his description to the police of his day prior to meeting the victim
and his interaction with the victim in his house.  She noted a "bizarre" moment in which Alford
suggested that if he tells the truth, "I don't think that will allow me to walk out of here tonight and
have fish and chips like I had planned at Cole's."

But again consider that statement in its context.  Who's thinking about dinner
weapon [*sic*: when] detectives, experienced detectives, are searching your house
and are questioning you about a murder.  And you're talking about, oh, if I tell you
the truth, I don't get to go have fish and chips?  That's bizarre.  *That is showing a
disconnect between again somebody who did something by accident and is being
questioned about it, that is a peculiar thing to say.*

Id. at 55-56 (emphasis added).  At multiple other points, she again emphasized his failure to
mention the need for self-defense in the car, as he had testified at trial:

He's talking about why he did what he did and what's he saying?  Ignorant actions?
He's telling the detectives why he had to do what he did.  *There's nothing about a
car.  There's nothing about danger.  There's nothing about fear.  Not word one.*

Id. at 57 (emphasis added).

Uh, I had to do something, uh, huh, to stop him.  That's the only thing he said about
the car.  Again there is absolutely no description whatsoever about what he was
stopping.  And all you had for context of what he's talking about are the ignorant
actions that he referred to earlier and the loose hands and too many accusations and
comments.  *If you had an experience where you were really scared for you and
your youngest daughter, and because you were so scarred of that danger, you
started hitting a guy in the head and the holy - - whatever.  The gun went off.
Wouldn't that be an obvious place to say it?  Instead of I had to do something.
There's no detail there.  And when did you get detail?  After he had almost two
years to think about it.  After he had almost two years knowing what he's charged
with.  That's when all of a sudden he's providing you with detail.*

Id. at 58 (emphasis added).

All in all, the prosecutor's summation of Alford's interrogation occupies over 10 pages of
the 102-page transcript of her closing argument.

The remainder of the closing argument was spent dissecting Alford's trial testimony,
which she repeatedly characterized as not worthy of belief because, in large part, of its
inconsistency with his statements to the detectives.  See, e.g., id. at 67 ("So him lying with this

14

outlandish story about [the gun] being in a camera case that was already in the car is an effort to

preclude you from inferring premeditation and planning . . . and that's why he told three different

versions.  Because–and the first one was the truth."); <u>id.</u> at 69 ("First of all, would you use the

word 'gentleman' to describe somebody you believe behaved like a beast toward your daughter . .

. ?  Would you call that man a 'gentleman'?  No.  So what do you know?  The 'gentleman' came

out.  It is true.  The other stuff isn't."); <u>id.</u> at 81 ("The way he described what happened to Mr.

Heath was bizarre.  . . . With no register of any emotion.  Any sadness other than the use of the

word 'unfortunately,' which again was odd at that point how he was speaking."); <u>id.</u> at 85 ("Now,

he testified there was no plan but what did he say?  He said he got lost at one point.  How do you

get lost if you don't have a designation [sic] in mind?").  During some of these points, she again

returned to the interrogation and compared it to the testimony:

> Just as when he was speaking with the detectives, you'll notice that just about half
> of that interview is him describing concrete business.  And his business that had
> gone bankrupt.  That is not consonant with somebody having mistakenly shot
> somebody and killed them.

<u>Id.</u> at 70.

> So again this story so that it can be an accident of hitting him in the head with the
> butt of the gun but shooting him like this cannot be reconciled.  This is physical
> evidence folks.  It cannot be reconciled.  *And I want you to think very critically*
> *about all these different explanations about what happened and how it was an*
> *accident.  Two years; okay.  23 months.  To think about what you're going to say to*
> *a jury.  Can't be too crazy from what you said to the detectives before, you're stuck*
> *with that because it's recorded.  You have almost two years to think about what*
> *you're going to testify about.  In that period of time you get educated about the*
> *elements of your charges.  So what's the only thing he can say to justify shooting*
> *Mr. Heath in the car?  Nothing that he said back at the house.  Nothing.  Not heat of*
> *passion.  It's not sufficient provocation.  There was no danger except when he all of*
> *a sudden started making up these threats. ... So nothing he said to the detectives*
> *was going get him off the hook for this.  Nothing.  So in that intervening period of*
> *time he got to think of something he would tell you for the first time when he started*
> *testifying.  And that is, oh, we were in immediate peril because I thought we were*
> *going to get serious injury from crashing.*
>
> …
>
> *He used that particular expression "serious injury."  Think about his speech*
> *patterns at other times you heard him talk.  That's a legal expression.  It's a legal*
> *term as relates to a defense.  Now, again nothing of that before the first time he gets*
> *up and testifies.  And he knew by the time he got to trial that nothing he described to*
> *the detectives counted legally.  Nothing.*  So what did he give you?  All of a sudden
> for the first time he talked about, oh, he was a parolee.  He said he was out of San
> Quentin.  He said he could do whatever he wanted to me with impunity.  Even

15

though of course he couldn't because he was on parole. *But why wasn't that told to the detectives?* If this is a super scary parolee guy, of course he hadn't been arrested for a violent assault in over ten years, but leaving that side for a moment, *if this is a super scary guy how do you not tell the detective that? How is that something you omit from the period of time when you're talking about what's happening in the house? How do you talk to the detective the whole time and never say you're scared? And never say you felt you were in danger?*

Id. at 82-84.

Finally, the prosecutor ended her argument by contending to the jury that there was not enough evidence to "go down from second degree murder" but that there was evidence to "go up" to first-degree murder:

Now, you got to ask yourselves why would somebody lie so much about those particular things? They're not selected at random. They're very specific things he lied about. Every single one of them relates to one of the elements of murder. Every single one of them except those that might relate to murder and also trying to shield his daughter from being found guilty. All of them. Every single one. So what do you know? What do you inevitably have to conclude from that? He's guilty of murder. You don't have any, not an iota of credible evidence to go there. There isn't any. It's not an accidental discharge. It's not defense of either himself or his daughter. There really wasn't even any good evidence when he had the chance to say it about how he felt that he was in imminent danger of death or great bodily injury. And there was no evidence that he actually believed that the immediate use of deadly force was necessary to defend against that danger.

…

There is nothing to go down from second degree murder. So you're here. What is the evidence to go on? The evidence to go up you have two significant pieces of evidence. . . .

Id. at 96-97.

From its examination of the prosecution's closing argument, the Court agrees with Alford on several key points. First, the prosecution spent a significant amount of its closing argument discussing Alford's interrogation statements. Second, the prosecution used the interrogation primarily as a means of discrediting Alford's testimony at trial that his conduct was accidental and in self-defense. And third, the prosecution sought to discredit Alford's testimony as part of a strategy to suggest that he was concealing a more damaging version of events than the one described in his trial testimony, and therefore to encourage the jury to return a conviction for murder rather than manslaughter or an acquittal.

The Ninth Circuit recently analyzed a closing argument under Brecht within a similar context, in Garcia v. Long, 808 F.3d 771 (2015). In that case, the defendant was charged and

16

1  convicted of one count of forcible rape of his step-granddaughter and eight counts of lewd and

2  lascivious acts on a minor.  Id. at 774.  Over defendant's objections, the trial court admitted a

3  statement by Garcia during a pre-trial interrogation in which he admitted to sexual contact with the

4  minor but insisted that she initiated the contact.  Id. at 775.  Garcia did not testify, but the minor

5  victim did.  Id.  At closing argument, Garcia's counsel said little about the counts of lewd and

6  lascivious acts and instead focused on reasonable doubt regarding the count of forcible rape.  Id.

7  Affirming the district court on habeas review, the Ninth Circuit held that the admission of the

8  confession violated Garcia's Miranda rights because he responded "no" to the police's question

9  "do you wish to talk to me?"  Id. at 781.

10      Turning next to the issue of harmlessness, the Ninth Circuit focused almost exclusively on

11  the prosecution's closing argument in concluding the error was not harmless under Brecht.  Id. at

12  781-84.  It noted that Garcia's interrogation was "the focal point" of the prosecution's closing

13  argument, and that the prosecutor compared his interrogation with the minor's testimony to

14  discredit Garcia.  Id.  As Judge Bybee explains, "[a]ccording to the prosecutor, Garcia's 'pack of

15  lies' showed that Jane [Doe] was telling the truth, and Garcia's admission of 'sexual misconduct'

16  lets us know what kind of man he is."  Id. at 783.  The Ninth Circuit further noted that the

17  interrogation "enable[d] the prosecution to make effective use of Garcia's 'flip-flopping'" and that

18  "[i]t was no accident that the prosecutor's closing arguments pored over Garcia's interrogation

19  statements."  Id. at 784.  Moreover, the Ninth Circuit noted that the admission of the interrogation

20  likely forced defense counsel to alter its strategy.  Because "in his own words, Garcia said he

21  touched Jane Doe," defense counsel "could not deny that Garcia had molested Jane but could only

22  dispute the rape charge by arguing that Garcia never used force or fear."  Id.  Finally, the Ninth

23  Circuit explained that the state appellate court "misse[d] the point" when it found the error

24  harmless by concluding that the interrogation alone could not have grounded the rape charge since

25  Garcia "steadfastly denied" it.  Id.  "That Garcia's interrogation statements, standing alone, were

26  insufficient to prove his guilt does not mean that they did not substantially influence the jury's

27  verdict."  Id.  On the contrary, the prosecutor told the jury that "obviously I played that tape for

28  you for a reason," that Garcia "couldn't keep the story straight," that he "had to keep flip-

United States District Court
Northern District of California

flopping," and that "he admitted that he was sexually attracted to his own granddaughter." Id.

Garcia's analysis is directly applicable to this case. As in Garcia, the prosecutor "pored over" Alford's interrogation in her closing statement with the primary aim of discrediting him. While the government asserts that "the prosecutor's references to the interview actually made up a small portion of her lengthy argument," ECF No. 21 at 20, a close examination of the closing argument belies this representation. The prosecution repeatedly described Alford as "lying" and making up a story to cover up the truth. She referred to the interrogation in both the introductory and concluding portions of her argument, spent over ten pages of her argument on a detailed dissection of the interrogation, and referenced it numerous times throughout her statement. Alford's testimony and his interrogation — and the comparison between the two — were undoubtedly the focus of the prosecution's presentation to the jury. Garcia, 808 F.3d 771, 783 (9th Cir. 2015) ("Garcia's interrogation statements were the focal point of the prosecution's closing argument").

Moreover, much like in Garcia, the admission of the interrogation may have played a significant role in his strategic decision to acknowledge killing the victim and seek a conviction for manslaughter rather than murder. Garcia also clarifies that the content of the erroneously admitted evidence alone, in comparison to the other evidence admitted at trial, is not dispositive. Rather, it matters how the prosecution *uses* that evidence for other purposes such as discrediting the defendant.

Accordingly, the Court concludes that the prosecution's consistent, repeated, and extensive references to Alford's interrogation indicate that the interrogation caused Alford actual prejudice. The prosecution's closing argument makes clear that Alford's interrogation played a critical role in the theory she presented to the jury in support of a conviction for second-degree murder rather than manslaughter. In light of this, the Court has no difficulty in concluding that introduction of the interrogation, and the use to which it was put, had a substantial and injurious effect or influence in determining the jury's verdict.

### 2.    Jury Requests

In addition to the closing argument, Alford also points to the fact that the jury made several

18

United States District Court
Northern District of California

requests during deliberation indicating that the prosecution's reliance on the interrogation significantly affected their decision.  ECF 18 at 33.  On the third day of deliberation, they requested to rehear Alford's testimony "from when he received the gun until when he met Hans Heath."  Id.  On the same day, they also asked to "watch David Alford's interrogation w/ the detectives," and then on the following day, requested "some speakers to hear the interrogations" of Alford and his daughter.  Id.  Finally, on the fifth day, they requested clarification on the distinction between voluntary manslaughter and second degree murder.  Id.  All of these requests, Alford argues, show that the prosecutor's strategy of discrediting Alford's testimony through his interrogation had a significant effect on the jury, turning them away from their consideration of manslaughter or acquittal in favor of murder.  Id. at 32-33.

The government responds that the jury made numerous other requests unrelated to the police interview, and thus "the circumstances surrounding the jury's deliberations cannot bear the significance petitioner places upon them."  ECF No. 21 at 22.  There may be cases in which, considered by themselves, a jury's requests to rehear certain pieces of evidence do not show those pieces of evidence had a "substantial and injurious effect" on the jury's decision.  But the requests here do not exist in isolation; they must be viewed in connection with the prosecution's decision to focus extensively on the interrogation in order to discredit Alford's testimony.  Considered in total, the jury's multiple requests to rehear the interrogation provide powerful evidence that the prosecution's strategy played a significant role in the jury's deliberations.

In sum, the erroneous admission of Alford's interrogation was not harmless.  As in Garcia, the Court concludes that the prosecution's focus on Alford's interrogation in comparison to the testimony offered at trial had a significant effect on the jury's decision.  The multiple jury requests related to that interrogation confirm that the prosecution's strategy successfully affected the jurors.  Accordingly, the only reasonable conclusion is that the admission of Alford's interrogation was not harmless.

**B.    Court of Appeal's Analysis**

The California Court of Appeal concluded that the admission of Alford's interrogation was harmless by comparing the statements made in his interrogation to the ones made in his testimony.

It noted that the statements made following Alford's request for counsel "offered only a vague and amorphous tableau in which the defendant and the drunk, addled, aggressive, and vulgar Heath had a confrontation, one sufficiently serious for defendant to be worried about penal consequences." People v. Alford, No. H036961, 2013 WL 1248131, at *10 (Cal. Ct. App. Mar. 28, 2013) (unpublished).  The interrogation "yielded nothing particularly inculpatory beyond a hazy description of what might be some form of unlawful homicide, but not one that would necessarily constitute murder." Id.  Instead, "it was defendant's own testimony that established that he committed the second degree murder of Heath." Id.  It noted that the jury received instructions on self-defense and manslaughter, and suggested that therefore "admission of the portion of the interrogation which defendant sought to have suppressed *benefitted* him by providing the jury with a reason to find that he committed the lesser offense of manslaughter, if any criminal offense at all." Id. (emphasis added).  Therefore, the panel concluded, "the jury's verdict was unattributable to the playing of the recording of defendant's interrogation by the detectives." Id.

There are two major errors in this analysis.  First, the Supreme Court has made clear that the test under Brecht is not whether the remaining evidence in a trial, excluding the erroneously admitted pieces, *would have* been enough to nevertheless obtain a conviction.  Rather, the proper inquiry is whether the erroneously admitted evidence caused *actual* prejudice in the trial that occurred.  "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error.  It is rather, even so, whether the error itself had substantial influence." O'Neal v. McAninch, 513 U.S. 432, 435 (1995) (quoting Kotteakos v. United States, 328 U.S. 750, 764-65 (1946).

Here, however, the California Court of Appeal based its harmlessness holding on its conclusion that Alford's trial testimony alone would have been enough to justify his conviction for murder.  See id. ("But to repeat, it was defendant's own testimony at trial that pointed inescapably toward express or implied malice murder, which is what the jury found.").  Stretching this far into the hypothetical erroneously strays beyond the scope of Brecht.  It assumes, for example, that Alford would have pursued the same defense strategy even if the interrogation had not been

20

United States District Court
Northern District of California

admitted; would still have decided to testify; and would have testified in exactly the same way.

Second, the California Court of Appeal misapplies <u>Brecht</u> by relying exclusively on its own comparison of Alford's interrogation and his testimony, without consideration of how those pieces of evidence were actually used at trial. Once again, <u>Brecht</u> requires the court to decide whether the evidence had an actual effect on the trial itself. Yet the California Court of Appeal bases its holding on its own theory of how the evidence could or would most likely be interpreted. It states definitively that it was Alford's testimony that "established that he committed the second degree murder" and that "the jury found" that "defendant's own testimony at trial pointed inescapable towards" murder. But it is impossible to know if this was in fact how the jury reached its conclusion.[2] Indeed, as noted above, the prosecution's closing argument indicates that the prosecution's view of the testimony was the *exact opposite* of the Court of Appeal's. Far from relying on Alford's testimony as a true and accurate account of events that suggested second degree murder, the prosecutor used Alford's interrogation to suggest that he was lying in his testimony, and that the jury should reject his statements in court that he was defending himself and his daughter and shot the victim by accident.

The Ninth Circuit recognized the same error in the state court's reasoning in <u>Garcia</u>. As noted in the previous section, the state court in that case rested its harmlessness determination on "its conclusion that 'the jury could not have used [Garcia]'s interview statements to convict him of the rape charge." <u>Garcia</u>,808 F.3d at 784. Yet, as the Ninth Circuit explained, this analysis ignored the prosecution's statements that Garcia's interrogation indicated he "couldn't keep the story straight" and "had to keep flip-flopping." <u>Id.</u> "Any reasonable application of <u>Chapman</u> would have to account for these statements by the prosecution, yet the state court never acknowledged them." <u>Id.</u> Here, similarly, the Court of Appeal unreasonably discounted the prosecution's extensive portrayal of Alford's interrogation in favor of its own interpretation of the

---

[2]   Similarly, even if the trial court decided to give a self-defense instruction based on the admission of Alford's interrogation, this does not enable the California Court of Appeal to assume that the interrogation was "beneficial" to the defendant in light of the various other ways it was put to use in the prosecution's argument.

1   available evidence.[3]

2       For these reasons, the Court concludes that the California Court of Appeal unreasonably

3   misapplied the law applicable to its harmlessness analysis.  The admission of the interrogation in

4   Alford's trial was not harmless.

5   **C.    Government's Responses**

6       The government offers a number of responses challenging this conclusion.  First, they

7   point to the "significant amount of admissible evidence establishing petitioner's guilt" outside of

8   the erroneously admitted interrogation, including Alford's testimony and other physical evidence

9   offered at trial.  ECF No. 21 at 17-18.  As an initial matter, much of the available evidence (such

10  as the presence of the victim's blood in the car) only showed that the victim was shot and killed in

11  Alford's car, a fact that is consistent with the defendant's strategy of arguing for self-defense or

12  for a lesser manslaughter charge.  Further, this reasoning contains the same error as the California

13  Court of Appeal's: it assumes harmlessness can be determined based exclusively on a comparison

14  of the admissible evidence with the inadmissible evidence, without consideration of how the

15  evidence was actually used at the trial.  To be clear, then, the flaw in the government's argument is

16  not its conclusion that there was enough other evidence outside of the interrogation to ground a

17  conviction for second-degree murder.  Rather, the flaw is the government's belief that the

18  existence of this other evidence alone proves the interrogation therefore had no effect on the actual

19  result of the trial.

20      Next, the government contrasts this case with others in which the court found prejudice

21  because this case does not involve a confession to the crime, which would be more damaging

22  evidence.  ECF No. 21 at 19.  But Alford's statements to detectives were hardly exculpatory.  It is

United States District Court
Northern District of California

---

[3]    The only mention of the prosecution's closing argument in the California Court of Appeal's opinion is within footnote 4 of the opinion.  People v. Alford, No. H036961, 2013 WL 1248131, at *10 n.4 (Cal. Ct. App. Mar. 28, 2013) (unpublished).  It makes two points in reference to the closing argument.  First, it quotes the prosecution's statement that "the defendant 'did not tell [the detectives] one thing,' '[n]ot even a little thing that would constitute a defense to the charge of murder,'" and asserts that this statement was "inaccurate" and therefore "we must presume" that the jury discounted it.  Id.  Second, it quotes the prosecution as "conced[ing]" that most of the interrogation "'related to what happened at the house,' as opposed to in the car afterward," and "'it was consistent for the most part with his testimony in court.'"  Id.

1    true that Alford did not confess in his interrogation to each and every element of second degree

2    murder.  He did, however, place himself with the victim, stated that the victim was acting in a way

3    that made him believe he needed to "do something," and acknowledged doing "something" that

4    could lead to him spending time in jail or prison.  More importantly, the government's argument

5    misapprehends the nature of the prejudice here, which is not that the government relied on the

6    inculpatory nature of the interrogation, but that it pointed to inconsistencies between the

7    interrogation and Alford's trial testimony to paint him as a liar.  The government's argument is

8    also another variation on the same line of reasoning used by the Court of Appeal — that the

9    relative weakness of the erroneously admitted evidence in comparison to the strength of the

10   admissible evidence proves the error of admission was harmless.  For the reasons stated above,

11   this line of reasoning misinterprets Brecht and Chapman.

12       Finally, the government argues that even if the admission of the interrogation caused

13   Alford actual prejudice, the error was nevertheless harmless because the interrogation would have

14   been admissible in order to impeach Alford's allegedly inconsistent testimony.  ECF No. 21 at 19.

15   "Given that the primary purpose petitioner ascribes to the prosecution's use of the recorded

16   statement was impeachment, the prosecution's use of the prior interview slightly earlier than it

17   otherwise would have been introduced did not have a substantial and injurious effect or influence

18   on the jury's verdict."  ECF No. 21 at 20.

19       There are a number of problems with this argument.  For one, the government ignores the

20   fact that evidence admitted solely for impeachment cannot be used for other purposes.  See Fed. R.

21   Evid. 105.  It also implausibly assumes that petitioner's testimony would have remained exactly

22   the same even if he knew his prior interrogation statement would not be played for the jury, or

23   played only for impeachment purposes.  In fact, as noted above and as argued by the petitioner, it

24   is entirely possible that without the admission of the interrogation and the damaging statements

25   contained within it, Alford would have decided not to testify at all. [4]  ECF No. 26 at 7-8.  Alford

26   _____

27   [4]       The government asserts that this Court can safely assume Alford would have testified at
     trial regardless because "the only evidence that could have supported his defenses of self-defense
28   or provocation was his own testimony," and because he "listed himself as a trial witness before the
     trial court even considered the admissibility of his statement to the police."  ECF No. 21 at 19.

United States District Court
Northern District of California

1   cites to <u>Harrison v. United States</u>, 392 U.S. 219, 222-226 (1968), which held that when an illegally

2   obtained confession was erroneously admitted at trial, and this admission induced the defendant to

3   testify to offer his own version of the events, both the confession and the subsequent testimony

4   cannot be used to ground a conviction.  Using the same principle, the Court cannot assume that

5   Alford's testimony would have occurred in the same form in the absence of the admitted

6   interrogation.[5]  Accordingly, it cannot conclude that the erroneously admitted interrogation was

7   harmless because the prosecution could otherwise have submitted it as impeachment evidence.

**CONCLUSION**

9        Alford's petition for writ of habeas corpus is granted.  The prosecution's focus on the

10   erroneously admitted interrogation and the jury's requests to re-view and re-hear it demonstrate

11   that the <u>Miranda</u> violation had a "substantial and injurious effect" on the conviction and was

12   / / /

13   / / /

14   / / /

15   / / /

United States District Court
Northern District of California

_____

        This argument is not persuasive.  Alford notes that the filing "listing himself as a witness" in fact listed twenty individuals who "may" appear as witnesses, of which only two ended up testifying.  ECF No. 26 at 7.  Judges and lawyers of any experience know that someone's appearance on a witness list does not mean that person will inevitably testify.  Further, the government's assumption that Alford would have still testified skips over numerous steps, such as that Alford would have still pursued a theory of self-defense or provocation, or that the prosecution would have survived a motion for a directed verdict in the absence of any statement by any witness to the actual events at issue.

[5]     Nor does the Court assume the opposite ─ that Alford would _not_ have testified in the absence of the erroneous admission ─ as Alford suggests in his traverse.  He argues that under <u>Harrison</u> and its Ninth Circuit progeny, <u>Lujan v. Garcia</u>, 734 F.3d 917 (9th Cir. 2013), the California Court of Appeal should not have considered Alford's testimony at all.  ECF No. 26 at 7.
        However, <u>Harrison</u> makes clear that its holding was an exception to the rule based on the fact that the defendant's testimony was specifically induced by the desire to explain other, erroneously admitted statements.  In <u>Harrison</u>, the Supreme Court noted that defense counsel originally announced to the jury that the defendant would not testify, and only changed his mind after the defendant's prior confessions were admitted into evidence.  <u>Harrison</u>, 392 U.S. at 225.  Likewise, in <u>Lujan</u>, 734 F.3d at 922, the Ninth Circuit noted that petitioner testified in order to explain the circumstances of his confession and that defense counsel averred he would not have testified "but for" the trial court's denial of his motion to suppress his confession.
        Here, by contrast, petitioner has not sufficiently shown that his testimony was directly induced by the admission of his interrogation.  It was therefore not unreasonable for the Court of Appeal to decline to apply <u>Harrison</u> to this case.

therefore not harmless.  The California Court of Appeal unreasonably misapplied the law of

Brecht and Chapman in concluding to the contrary.

**IT IS SO ORDERED.**

Dated: May 31, 2016



_____
JON S. TIGAR
United States District Judge